*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0584**

State of Minnesota,
Respondent,

vs.

Julian Sanchez-Sanchez,
Appellant.

**Filed April 27, 2015
Affirmed
Smith, Judge
Concurring specially, Rodenberg, Judge**

Hennepin County District Court
File No. 27-CR-13-9468

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Mary F. Moriarty, Hennepin County Public Defender, Peter W. Gorman, Assistant Public Defender, Minneapolis, Minnesota (for appellant)

Considered and decided by Chutich, Presiding Judge; Rodenberg, Judge; and Smith, Judge.

UNPUBLISHED OPINION

**SMITH**, Judge

We affirm appellant's sentence because the greater-than-double upward durational departure is supported by severe aggravating circumstances based on the facts admitted and evidence in the record.

## FACTS

After a lengthy FBI investigation into a methamphetamine distribution network, the state charged appellant Julian Sanchez-Sanchez with conspiracy to commit a first-degree controlled substance crime. Sanchez-Sanchez pleaded guilty to the charge and admitted his participation in the conspiracy.

The state gave notice that it intended to seek an upward sentencing departure because the offense was a major controlled substance offense, a large number of people were put at risk by the offense, and the offense involved three or more active participants. Sanchez-Sanchez waived his right to a sentencing jury.

At a court sentencing trial, the district court concluded that three reasons existed for an upward departure and made corresponding factual findings. First, the district court found that the offense was a major controlled substance offense because Sanchez-Sanchez occupied a high-level position within the distribution network and a high degree of sophistication and planning was involved. Second, the district court found that the offense involved three or more active participants because the conspiracy involved at least 20 people and a "significant number" were active participants. And third, the district court found that a large number of people were put at risk by the offense because

methamphetamine is a "particularly dangerous" neurotoxin and the conspiracy was distributing the drug in vast amounts. After giving consideration to mitigating factors as well, the district court sentenced Sanchez-Sanchez to 240 months' incarceration, an upward durational departure of 279% from the 86-month guidelines sentence.

## DECISION

Sanchez-Sanchez argues that the district court erred in its decision to depart upwardly from a guidelines sentence for five reasons. We review an upward departure from a guidelines sentence for an abuse of discretion. *Tucker v. State*, 799 N.W.2d 583, 585-86 (Minn. 2011). The district court may only depart upwardly from a guidelines sentence if "substantial and compelling circumstances based on aggravating factors" are present. *Dillon v. State*, 781 N.W.2d 588, 595 (Minn. App. 2010) (quotation omitted), *review denied* (Minn. July 20, 2010). To impose a sentence that is more than double the guidelines sentence, there must be severe aggravating circumstances. *Id.* at 596. We review de novo "whether a valid reason to depart exists" and whether a departure reason's severity justifies a sentence that is more than double the presumptive sentence. *Id.* at 598. An upward departure will be reversed if the reasons for departing are "improper or inadequate" or the record does not support the reasons. *Tucker*, 799 N.W.2d at 586 (quotation omitted).

### A.

Sanchez-Sanchez argues that the district court abused its discretion by sentencing him to 240 months when his codefendants received shorter sentences. The guidelines are designed to impose proportionate sentences because "convicted felons similar with

3

respect to relevant sentencing criteria ought to receive similar sanctions." Minn. Sent. Guidelines 1 (Supp. 2011). While we acknowledge that many of Sanchez-Sanchez's codefendants received shorter sentences, the district court did not impose a disproportionate sentence or abuse its discretion. First, only one codefendant alleged to be at the top level of the conspiracy had been sentenced at the time, and he received the statutory maximum sentence. *State v. Ayala-Leyva*, 848 N.W.2d 546, 552 (Minn. App. 2014) (reversing the sentence because the sentencing jury did not make proper factual findings), *review granted* (Minn. Aug. 5, 2014). Moreover, the sentencing criteria were not the same due to variations in criminal history scores, mitigating and aggravating factors, and plea agreements. The district court appropriately considered factors that may not have been present for the codefendants, including Sanchez-Sanchez's position in the hierarchy of the conspiracy and his role in facilitating the interstate movement of drugs and money. *See State v. Starnes*, 396 N.W.2d 676, 681 (Minn. App. 1986) ("A defendant is not entitled to a reduction in his sentence merely because a co-defendant or accomplice has . . . received a lesser sentence.").

**B.**

Next, Sanchez-Sanchez contends that the district court failed to make factual findings in support of its stated departure reasons. We have held that aggravating factors must be supported by adequate factual findings. *Id.* at 557-58. For example, if the district court departs because the crime is a "major controlled substance crime," it must specifically name which of the required circumstances existed. *Id.* at 558. Here, the district court departed for a major controlled substance offense and made corresponding

4

findings that Sanchez-Sanchez occupied "a high position within the conspiracy" and that the offense "involved a high degree of sophistication and planning." *See* Minn. Sent. Guidelines 2.D.2.b.5.e-f (Supp. 2011). The district court properly named two specific circumstances as required by the guidelines. In addition, the district court found that the crime involved "at least . . . 20 people" and that "a significant number of those persons" were active participants to support departing for a conspiracy with three or more active participants. *See* Minn. Sent. Guidelines 2.D.2.b.10 (Supp. 2011). Finally, the district court found that the drugs involved were "particularly dangerous" neurotoxins and that the amounts at issue put "many thousands of people in danger" to support departing on the basis of the number of people at risk. *See State v. Ford*, 539 N.W.2d 214, 230 (Minn. 1995) (including conduct that "put a number of people at risk" among reasons to justify departure). Therefore, each departure reason is supported by sufficient factual findings.

## C.

Sanchez-Sanchez also argues that the district court's decision "was based exclusively upon hearsay." Because Sanchez-Sanchez did not object at trial on the basis of hearsay, we review for plain error. *See State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). To grant relief, "there must be (1) error, (2) that is plain, and (3) affects substantial rights." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). An error is plain "when it contravenes a rule, case law, or a standard of conduct, or when it disregards well-established and longstanding legal principles." *State v. Brown*, 792 N.W.2d 815, 823 (Minn. 2011). An error affects substantial rights if "there is a reasonable likelihood that the error substantially affected the verdict." *Id.* at 824 (quotation omitted).

The rules of evidence do not apply at a sentencing proceeding without a jury.[1] Minn. R. Evid. 1101(b)(3). Indeed, district courts routinely consider presentence investigation reports and victim-impact statements, both of which generally include hearsay statements, before making a sentencing decision. *See, e.g.*, *State v. Alexander*, 855 N.W.2d 340, 344 (Minn. App. 2014) (presentence investigation report); *Wells v. State*, 839 N.W.2d 775, 777 (Minn. App. 2013) (victim-impact statement), *review denied* (Minn. Feb. 18, 2014). Accordingly, the district court did not plainly err by admitting hearsay testimony.

**D.**

Next, Sanchez-Sanchez contends that the district court's reasons for departing are inconsistent with the law. Because the guidelines and caselaw permit the district court to consider each of the stated departure reasons, this argument fails.

Sanchez-Sanchez cites *State v. McIntosh*, 641 N.W.2d 3, 11-12 (Minn. 2002), in support of the contention that the "major controlled substance crime" factor impermissibly duplicates the offense's Category 9 ranking in the guidelines. However, *McIntosh* merely cautions that the factor "could . . . implicate" the quantity of drugs required to commit the offense. 641 N.W.2d at 11. In this case, the district court appears to have relied not on the quantity of drugs but on evidence demonstrating that Sanchez-

---

[1] Minn. R. Evid. 1101(b)(3) excludes application of the Minnesota Rules of Evidence from "proceedings." But, under *Blakely v. Washington*, a jury trial is required to determine if aggravating factors are present. 542 U.S. 296, 313-14, 124 S. Ct. 2531, 2543 (2004). The Minnesota Supreme Court held in *State v. Rodriguez* that the Minnesota Rules of Evidence apply in a jury determination of aggravating factors. 754 N.W.2d 672, 683-84 (Minn. 2008). In this case, however, Sanchez-Sanchez waived his right to a jury determination.

Sanchez orchestrated sophisticated transportation methods to move drugs from California to Minnesota and rented a house for sale and storage of drugs as opposed to operating as a street-level dealer.

Next, Sanchez-Sanchez contends that "there is no direct evidence" tying him to the sophisticated planning of the conspiracy because he was living in California, while the street-level drug transactions were taking place in Minnesota. But there is ample direct evidence. Sanchez-Sanchez admitted that he was part of the conspiracy and that he rented the house and knew that it was being used to sell and store drugs, and the recorded conversations indicate that he orchestrated transportation of the drugs that originated in California. Furthermore, the FBI agent testified that Sanchez-Sanchez arranged transportation that used sophisticated concealment techniques. The fact that Sanchez-Sanchez was in California did not hinder his ability to actively participate in the planning and logistics of the conspiracy.

Sanchez-Sanchez also argues that it was inappropriate to consider the "three or more persons" factor because the crime charged required two or more persons. However, we have concluded that this factor is not duplicative of an element of conspiracy because it requires at least one additional person. *See Ayala-Leyva*, 848 N.W.2d at 558.

Sanchez-Sanchez also asserts that the number of people put at risk is an improper factor because it is not listed in the sentencing guidelines. The sentencing guidelines clearly state that they provide a nonexclusive list of factors. Minn. Sent. Guidelines 2.D.2 (Supp. 2011). Moreover, the supreme court has applied this factor in other cases. *See, e.g.*, *State v. Edwards*, 774 N.W.2d 596, 607 (Minn. 2009); *State v. Ford*, 539

7

N.W.2d 214, 230 (Minn. 1995). It was not improper for the district court to consider this factor.

**E.**

Finally, Sanchez-Sanchez alleges that the district court judge implied that "the sentencing decision was not his, but lay elsewhere." The departure from a guidelines sentence "is an exercise of judicial discretion constrained by case law and appellate review." Minn. Sent. Guidelines 2.D (Supp. 2011).

At sentencing, the district court judge said:

> The decisions that you made Mr. Sanchez-Sanchez to participate in this conspiracy, to the extent that you did, those were the things that have put you where you are today, and they will place you where you will go for the next few years. Not my decision, I want you to understand that.

The district court's statement explains that its sentencing decision was based on Sanchez-Sanchez's participation in the charged crime, not the judge's whims. The district court did not fail to exercise proper discretion.

**Affirmed.**

**RODENBERG,** Judge (concurring specially)

I concur in affirming appellant's sentence and see no abuse of the district court's discretion in sentencing on this record, but I write separately to observe that the compression of a wide variety of dissimilar criminal activity into the definition of controlled substance crime in the first degree under Minn. Stat. § 152.021, subd. 1(1) (2014),[2] necessarily results in outcomes at odds with the stated purpose of the Minnesota Sentencing Guidelines.

"The purpose of the [Minnesota] Sentencing Guidelines is to establish rational and consistent sentencing standards that reduce sentencing disparity and ensure that the sanctions imposed for felony convictions are proportional to the severity of the conviction offense and the offender's criminal history." Minn. Sent. Guidelines 1.A. (2014).[3] The presumptive guidelines sentence is determined by a grid that lists the offense of conviction on the vertical axis and the offender's criminal history on the horizontal axis. Minn. Sent. Guidelines 2, 4.A (2014). Offense severity is determined by the statutory definition of the conviction offense, and increases with the seriousness of the offense, as determined by the offense ranks established in the sentencing guidelines. *See State v. Jackson*, 749 N.W.2d 353, 359 n.2 (Minn. 2008); *see also* Minn. Sent. Guidelines 5 (2014).

---

[2] The current statute proscribing drug sale crimes is identical to the statute in effect at the time of the offense.

[3] Although the offense dates in this case span 2010 to 2013, the most current sentencing guidelines are referenced because the guidelines have not changed substantially.

"As a general rule, the guidelines contemplate that offenders with similar criminal backgrounds who are convicted of similar crimes receive similar sentences; and offenders with more extensive criminal records who commit the most serious and violent offenses receive the greater sentences." *Taylor v. State*, 670 N.W.2d 584, 586 (Minn. 2003). First-degree controlled substance crime is defined as a severity level 9 offense under the guidelines. Minn. Sent. Guidelines 5 (2014). While appellant pleaded guilty to having occupied a central role in a massive methamphetamine-distribution conspiracy, he had a zero criminal history score at sentencing. With a zero criminal history score, this offense has a presumptive sentencing range of 74 to103 months, with 86 months as the presumptive sentence in the middle of this range. Minn. Sent. Guidelines 4.A; *see Jackson*, 749 N.W.2d at 359 n.2 ("All three numbers in any given cell constitute an acceptable sentence based solely on the offense at issue and the offender's criminal history score—the lowest is not a downward durational departure, nor is the highest an upward departure.")

Over the years the range and duration of the numbers in the cells have increased. *Taylor*, 670 N.W.2d at 586-87. In 2005, for example, the legislature "substantially broadened the sentencing ranges" to 20% above and 15% below the presumptive middle sentence. *Jackson*, 749 N.W.2d at 360. The purpose of this change "was to reduce aggravated durational departures." *Id.* The underlying purpose of the guidelines "will not be served if the trial courts generally fail to apply the presumptive sentences found in the guidelines." *State v. Leja*, 684 N.W.2d 442, 448 (Minn. 2004) (quoting *State v. Spain*, 590 N.W.2d 85, 88 (Minn. 1999)).

The statutory definition of a first-degree controlled substance crime includes all sales of methamphetamine occurring within a 90-day period amounting to a total of ten grams or more. Minn. Stat. § 152.021, subd. 1(1).[4] And "sale" is broadly defined to include a wide variety of actions, including to "give away" the drugs. Minn. § 152.01, subd. 15a (2014). Therefore, a seller of multiple pounds of methamphetamine for tens of thousands of dollars commits the *same crime* as a drug user who, on multiple occasions over a 90-day period, shares ten grams of methamphetamine with other addicts. The Minnesota Supreme Court has recognized that "typical does not mean minimal" and that the "typical offense" may be "more extreme than the minimum conduct required to violate the applicable statute." *Leja*, 684 N.W.2d at 450. But the broad range of conduct included within the definition of a first-degree controlled substance sale crime undermines the goal of proportionality that is the foundation of the guidelines: the presumptive guidelines sentencing range for an offender with no criminal history is the same for one who sells multiple pounds of methamphetamine over several years, and another who over a 90-day period shares ten grams of methamphetamine with others.

That the statutory definition has compressed dissimilar behaviors into a single defined criminal offense is evidenced not only by the range of sentences given to actors in the methamphetamine-distribution network of which appellant was a part, but also by the large number of departures from the presumed guidelines range in other first-degree cases. Even after the guidelines ranges were increased in 2005, the departure rates for

---

[4] This concurrence refers to methamphetamine because it is the drug at issue in this appeal. The same analysis, however, would apply to cocaine or heroin. Minn. Stat. § 152.021, subd. 1(1) (2014).

drug crimes suggest that there is no typical first-degree controlled substance sale crime. For example, there is a high departure rate among defendants convicted of first-degree controlled substance offenses, with 36% receiving the presumptive sentence, 34% receiving a mitigated durational departure, and 30% receiving a mitigated dispositional departure. Minnesota Sentencing Guidelines Commission, Report to the Legislature, January 15, 2015, available at http://mn.gov/sentencing-guidelines/ Figures 11 at pg. 19, and 12 at pg. 20. Some, as in the case now before us on appeal, are aggravated durational departures.[5] Less than half of all first- and second-degree drug offenders receive a presumptive sentence under the guidelines. *Id.*, Figure 13. This rate of departure does not indicate any error by the district judge in this case. Nor does it indicate any error by the judges who have imposed mitigated dispositional and durational departures in other first-degree cases. What it strongly indicates is that the definition of first-degree controlled substance offense includes a wide array of fundamentally different criminal behaviors.

The current weight-based classification scheme for controlled substance offenses was adopted in 1986 and 1989. *See* Beverly J. Wolfe, *Constitutional and Policy Concerns Pertaining to Weight-Based Statutory Classifications for Minnesota Controlled Substance Offenses*, 15 Hamline J. Publ. L. & Pol'y 81, 83-84 (1994). Since these weights were adopted, there have been conversations about lowering the severity level of various drug offenses under the sentencing guidelines. *See* John Stuart and Robert

_____

[5] There can be no aggravated dispositional departure for first-degree offenses, as the guidelines sentence is an executed sentence for all criminal history scores.

Sykora, *Minnesota's Failed Experience with Sentencing Guidelines and the Future of Evidence-Based Sentencing*, 37 Wm. Mitchell L. Rev. 426, 438-443 (2011) (discussing, generally, failed efforts to lower the levels for controlled substance possession offenses or re-rank controlled substance offenses). But, as demonstrated by this case and others involving this same methamphetamine-distribution conspiracy, not all first-degree controlled substance crimes should be ranked lower than a severity-level 9. *See State v. Ayala-Leyva*, 848 N.W.2d 546 (Minn. App. 2014) (reversing and remanding 360-month sentence, a greater-than-quadruple upward departure from presumptive 86-month sentence for first-degree controlled substance crime, with instructions concerning a greater-than-double durational departure), *review granted on other grounds* (Minn. Aug. 5, 2014); *State v. Hernandez-Espinoza*, A13-1081, 2014 WL 2441129 (Minn. App. June 2, 2014) (affirming 172-month sentence, a double-upward departure from the presumptive sentence), review denied (Minn. Aug. 19, 2014); *State v. Lopez-Martinez*, A13-0253, 2014 WL 902662 (Minn. App. Mar. 10, 2014) (affirming 172-month sentence, a double-upward departure from the presumptive sentence), *review denied* (Minn. May 20, 2014).

If the legislature wishes to promote the stated purposes of the guidelines of reducing sentencing disparity and ensuring that sentences are proportional, perhaps a statutory framework similar to the theft statutes should be considered. There is a broad range of behavior that constitutes "theft," but available sentences for theft offenses range from misdemeanors to 20-year felonies. *See* Minn. Stat. § 609.52, subd. 2 (2014) (defining variety of acts constituting theft). Most of the differences between levels of

offenses are based on the value of the property taken. *See id.*, subd. 3 (2014). But the legislature also has included a number of other factors bearing on the severity of the offense, including whether the property was taken from public funds, from a grave or coffin, from a motor vehicle, or from a building after a civil disaster. *See id.* The legislature also has separated identity theft as a specific type of theft that is punishable based on consideration of the number of victims and the total of direct and indirect monetary loss. Minn. Stat. § 609.527, subds. 1, 3 (2014). The legislature's careful identification of specific attributes of theft offenses as distinguishing one from another for sentencing purposes results in theft offenses under the sentencing guidelines ranging from severity level 1 (theft from an abandoned building, for example) to severity level 8 (identity theft). Minn. Sent. Guidelines 5.A. In theft cases, a sentencing judge has little occasion to depart from the sentencing guidelines as the definition of the crime of conviction is narrowly tailored to the minimum conduct proscribed.

District court judges have considerable discretion in sentencing, but may depart from the sentencing guidelines only when substantial and compelling reasons for departure are shown. *See, e.g.*, *Taylor*, 670 N.W.2d at 587. We review sentencing departures for abuse of discretion. *State v. Geller*, 665 N.W.2d 514, 516 (Minn. 2003). If the reasons for an upward departure are legally permissible and supported by the record, we will affirm the departure. *State v. Edwards*, 774 N.W.2d 596, 601 (Minn. 2009). Because the district court has broad discretion in sentencing, "we generally will not interfere with the exercise of that discretion." *State v. Kindem*, 313 N.W.2d 6, 7 (Minn. 1981) (noting that it is a rare case wherein reversal of a refusal to depart from the

presumptive guidelines sentence is warranted because, even when substantial and compelling circumstances are present, the district court has discretion).

Here, applying this deferential standard of review, the majority correctly determines that the district court did not err in its findings, nor did it abuse its discretion, in sentencing appellant as it did. But, as appellant rightly notes, the resulting sentence is inconsistent with other first-degree controlled substance crime offenders, including some others prosecuted in this conspiracy who received less severe sentences for criminal conduct apparently as serious, and perhaps more serious, than appellant's conduct. This is at odds with the principal purpose of the sentencing guidelines, which is to achieve consistent sentences for the same offenses committed by similarly situated offenders. As long as the definition of first-degree drug crimes includes significantly different criminal behavior, there will be departures from the guidelines by judges properly exercising their judicial discretion. But the resulting sentences will not conform to the ideals expressed by the sentencing guidelines.